# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

KENNITH McDOWELL, ROBERT MAULDING,                    **PLAINTIFFS**
LUTHER STRIPLING, RUDY KYLE, FRED DOLLAR,
JAMES JOSLIN, JAMES MILNER, JOE ELLIS,
DAVID ELLIS, DANIEL STRIPLING, and
JANET STRIPLING

v.                          NO. 4:08CV03979 SWW/HDY

ELBERT PRICE, Individually and as Trustee for         **DEFENDANTS**
Bud Price's Excavating Service, Inc., Profit-Sharing
Plan; Bud Price's Excavating Service, Inc., Retirement
Plan; Price's Utility Contractors, Inc., Retirement
Plan; and six unnamed plans; **MARY RUTH PRICE**,
Individually and as Trustee for Bud Price's Excavating
Service, Inc., Profit-Sharing Plan; Bud Price's
Excavating Service, Inc., Retirement Plan; Price's
Utility Contractors, Inc., Retirement Plan; and six
unnamed plans; **BUD PRICE'S EXCAVATING SERVICE,
INC., PROFIT-SHARING PLAN; PRICE'S UTILITY
CONTRACTORS, INC., RETIREMENT PLAN; BUD PRICE'S
EXCAVATING SERVICE, INC., RETIREMENT PLAN;
SIX UNNAMED PLANS; PRICE'S UTILITY CONTRACTORS,
INC.**, as plan administrator for Price's Utility Contractors,
Inc., Retirement Plan, and six unnamed plans; and
**BUD PRICE'S EXCAVATING SERVICE, INC.**, as plan
administrator for Bud Price's Excavating Service, Inc.,
Profit-Sharing Plan; Bud Price's Excavating Service,
Inc., Retirement Plan; and six unnamed plans

## FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following findings and recommendation have been sent to United States District Judge Susan Webber Wright. Any party may serve and file written objections to these findings and recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the Office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendation. The copy will be furnished to the opposing party. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The details of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, Arkansas 72201-3325

<u>RECOMMENDED DISPOSITION</u>

<u>BACKGROUND</u>. On February 15, 2012, the district court adopted the undersigned's recommendation and found the following regarding several issues in this case:

First, there is no genuine dispute of fact regarding the profit-sharing and defined benefit plans and the plaintiffs owed benefits. The following plaintiffs are owed benefits from the Price's Excavating Service, Inc., ("Price's Excavating") profit-sharing plan ("profit-sharing plan"): (1) Kennith McDowell; (2) Robert Maulding; (3) Luther Stripling; (4) Rudy Kyle; (5) James Milner; and (6) Janet Stripling, on behalf of Royce Stripling. The following plaintiffs are owed benefits from the Price's Utility Contractors, Inc., ("Price's Utility") defined benefit plan ("1997 defined benefit plan"): (1) Kennith McDowell; (2) Robert Maulding; (3) Luther Stripling; (4) Rudy Kyle; (5) Fred Dollar; (6) James Joslin; (7) Joe Ellis; (8) Daniel Stripling; and (9) Janet Stripling, on behalf of Royce Stripling.[1]

---

[1]

Three observations are in order. First, Royce Stripling died sometime before the plaintiffs filed their second amended complaint. <u>See</u> Document 299. Second, James Joslin died on or about December 22, 2011. <u>See</u> Document 452. Last, the defendants now maintain that Daniel Stripling is actually owed nothing. <u>See</u> Document 539 at 1.

Second, there is no genuine dispute of fact regarding the failure of the plan administrators to comply with the Employee Retirement Income Security Act ("ERISA") in providing the ERISA-required notices and information. As to count one, the plaintiffs did not receive timely plan funding notices for the 1997 defined benefit plan. As to count two, plaintiffs Kennith McDowell and Robert Maulding were not provided timely information about the profit-sharing plan or the 1997 defined benefit plan. As to count four, the plaintiffs were not provided with the ERISA-required information identified in that count. With specific regard to the 1997 defined benefit plan, the plan administrator's failure to give timely "204(h) notice" was egregious.[2]

Third, there is no genuine dispute of fact regarding the manner of determining the amount of benefits owed the plaintiffs from the profit-sharing plan. The following plaintiffs were owed benefits in the following amounts from the profit-sharing plan as of October 31, 2009: (1) Kennith McDowell, $18,776.00; (2) Robert Maulding, $34,692.00; (3) Luther Stripling, $4,054.00; (4) Rudy Kyle, $3,045.00; (5) James Milner, $17,402.22; and (6) Janet Stripling, on behalf of Royce Stripling, $38,608.00. All that remained was for the accounts to be made current and distributed.

Last, there is no genuine dispute of fact regarding the claim that the plaintiffs were harmed by the allegedly improper withdrawals made by defendants Bud and Mary Ruth Price ("Prices"); the plaintiffs were not.

---

[2]

Section 204(h) of ERISA, 29 U.S.C. 1054(h), requires the sponsor of a defined benefit plan to notify participants when an amendment will result in a significant reduction in the rate of future benefit accruals.

In the same February 15, 2012, order, the district court adopted the undersigned's recommendation and found that the following issues were still unresolved:

First, the amount of civil penalties to be imposed for the administrators' failure to provide the plaintiffs with the ERISA-required information for the profit-sharing and 1997 defined benefit plans.

Second, the percentages to be used in calculating the benefits owed the plaintiffs from the 1997 defined benefit plan.

On April 4, 2012, the undersigned addressed the second of the two unresolved issues identified by the district court, that being, the percentages to be used in calculating the benefits owed the plaintiffs from the 1997 defined benefit plan. The undersigned ordered the defendants to calculate the benefits owed the plaintiffs from that plan using the following percentages:

First, for the period beginning January 1, 1997, _i.e._, the effective date of the plan, up to January 1, 1999, forty-five percent;

Second, for the period beginning January 1, 1999, up to December 31, 2000, 47.50 percent; and

Last, for the period beginning December 31, 2000, up to January 1, 2003, _i.e._, the date benefit accruals under the plan were terminated, forty-nine percent.

On April 6, 2012, the undersigned established a series of deadlines for the parties' submission of pleadings and exhibits addressing the remaining unresolved issues in this case. The deadlines involved the following issues:

First, the up-to-date calculations for the plaintiffs owed benefits from the profit-sharing plan.

Second, the re-calculation of benefits for the plaintiffs owed benefits from the 1997 defined benefit plan.

Third, the amount of civil penalties to be imposed for the administrators' failure to provide the plaintiffs with the ERISA-required information for the profit-sharing and 1997 defined benefit plans.

Last, the amount of attorney's fees to be awarded.

The parties have now briefed the aforementioned issues. The undersigned has reviewed the parties' submissions and makes a final recommendation in the case at bar.

UP-TO-DATE CALCULATIONS FOR THE PROFIT-SHARING PLAN. The defendants have submitted calculations for the profit-sharing plan as of "the most recent plan year-end," see Document 544, which is October 31, 2011. The defendants represent that the following plaintiffs are owed benefits in the following amounts from the profit-sharing plan as of October 31, 2011: (1) Kennith McDowell, $21,017.79; (2) Robert Maulding, $38,833.27; (3) Luther Stripling, $4,537.56; (4) Rudy Kyle, $274.81; (5) James Milner, $19,479.70; and (6) Janet Stripling, on behalf of Royce Stripling, $35,941.30.[3] The plaintiffs do not seriously contest the calculations prepared by the defendants.

---

[3]

The balance of Rudy Kyle's account as of October 31, 2011, is $2,770.19 less than it was as of October 31, 2009. The difference is apparently due to the $3,000.00 withdrawal he made from his account some time before October 31, 2011. See Document 544 at 3. The balance of the account owed Janet Stripling, on behalf of Royce Stripling, decreased by $2,666.70 between October 31, 2009, and October 31, 2011, the only account to do so.

No genuine dispute of fact exists as to the up-to-date calculations owed the plaintiffs from the profit-sharing plan. The Court finds that the following plaintiffs are owed benefits in the following amounts from the profit-sharing plan as of October 31, 2011: (1) Kennith McDowell, $21,017.79; (2) Robert Maulding, $38,833.27; (3) Luther Stripling, $4,537.56; (4) Rudy Kyle, $274.81; (5) James Milner, $19,479.70; and (6) Janet Stripling, on behalf of Royce Stripling, $35,941.30. The defendants should be ordered to provide a second round of updated calculations and pay those amounts, taking into account any changes in the balances that have occurred since October 31, 2011.

REVISED CALCULATIONS FOR THE 1997 DEFINED BENEFIT PLAN. The defendants have submitted revised calculations for the plaintiffs owed benefits from the 1997 defined benefit plan. See Document 539. The defendants represent that the following plaintiffs are owed benefits in the following amounts from the 1997 defined benefit plan as of March 31, 2012: (1) Kennith McDowell, $106,699.12; (2) Robert Maulding, $150,297.19; (3) Luther Stripling, $108,699.12; (4) Rudy Kyle, 10,970.85; (5) Fred Dollar, $13,253.42; (6) James Joslin, $11,001.99; (7) Joe Ellis, $1,654.57; and (8) Janet Stripling, on behalf of Royce Stripling, $38,864.91. Although the defendants previously represented that Daniel Stripling was entitled to $268.29 in benefits, they now maintain that "[t]he plan required a minimum age of twenty-one for participants and [he] was less than the required age when his employment terminated." See Document 539 at 1. The plaintiffs do not seriously contest the revised calculations, and they offered nothing to rebut the plaintiffs' assertion that Daniel Stripling is entitled to no benefits from the plan.

No genuine dispute of fact exists as to the re-calculation of benefits owed the plaintiffs from the 1997 defined benefit plan. The Court finds that the following plaintiffs are owed benefits in the following amounts from the 1997 defined benefit plan as of March 31, 2012: (1) Kennith McDowell, $106,699.12; (2) Robert Maulding, $150,297.19; (3) Luther Stripling, $108,699.12; (4) Rudy Kyle, $10,970.85; (5) Fred Dollar, $13,253.42; (6) James Joslin, $11,001.99; (7) Joe Ellis, $1,654.57; (8) Daniel Stripling, $268.29; and (9) Janet Stripling, on behalf of Royce Stripling, $38,864.91.[4] The defendants should be ordered to distribute the amounts as soon as practicable.

As to the benefits owed Daniel Stripling from the 1997 defined benefit plan, the defendants represented in their statement of undisputed facts that he is owed benefits in the amount of $268.29. See Document 339 at 3. The undersigned adopted that representation and found he is owed that amount, see Document 450 at 32, a finding the district court adopted, see Document 459. The defendants now maintain that he is owed nothing because he did not meet the terms of the plan on account of his age. The undersigned recommends that the district court not disturb the previous finding that Daniel Stripling is owed benefits from the plan in the amount of $268.29. The defendants failed to produce the specific provision of the plan requiring a minimum age and have failed to produce proof of his age when his employment terminated.

---

[4]

The record reflects that Rudy Kyle, Fred Dollar, James Joslin, and Royce or Janet Stripling took substantial distributions from their accounts prior to March 31, 2012. See Document 539 at 3. Rudy Kyle took a $81,318.42 distribution, Fred Dollar took a $128,663.65 distribution, James Joslin took a $104,219.81 distribution, and Royce or Janet Stripling took a $27,969.60 distribution.

THE AMOUNT OF CIVIL PENALTIES. In the February 15, 2012, order, the district court adopted the undersigned's recommendation and found that civil penalties should be imposed on the following counts:

First, as to count one, penalties should be imposed for the failure of Price's Utility, the administrator of the 1997 defined benefit plan, to provide Kennith McDowell; Robert Maulding; Luther Stripling; Rudy Kyle; Fred Dollar; James Joslin; Joe Ellis; Daniel Stripling; and Janet Stripling, on behalf of Royce Stripling, with timely annual plan funding notices for the 1997 defined benefit plan.

Second, as to count two, penalties should be imposed for the failure of Price's Utility and Price's Excavating, the administrator of the profit-sharing plan, to provide Kennith McDowell and Robert Maulding with the information about the plans that they requested and were entitled to receive in a timely manner under ERISA.

Third, as to count four, penalties should be imposed for the failure of Price's Utility and Price's Excavating to provide the plaintiffs with the information in that count they were entitled to receive in a timely manner under ERISA.

The plaintiffs have now filed a motion seeking the imposition of civil penalties. See Document 465. In the motion, they ask that they be awarded a total of $878,486,910.00 in penalties and the penalties be imposed not only upon the plan administrators but also upon the Prices as trustees of profit-sharing and 1997 defined benefit plans. The plaintiffs believe such an award is justified because of the prejudice they suffered and the bad faith demonstrated by the administrators and the Prices.

The defendants object to the imposition of civil penalties, in effect asking the district court to reconsider the earlier finding that penalties should be imposed. They maintain that penalties should not be imposed for at least three reasons. First, they maintain that the disclosure requirements of ERISA have changed throughout the years and some requirements did not arise until after the plaintiffs were terminated. Second, the plaintiffs maintain that ERISA provides for the imposition of penalties only for a failure to provide information in response to a written request and the few requests made by the plaintiffs were answered in a timely manner. Last, they maintain that penalties have already been imposed, specifically, a benefit accrual formula most favorable to the plaintiffs owed benefits from the 1997 defined benefit plan will be used because of the administrator's egregious failure to give timely "204(h) notice." The defendants alternatively maintain that if penalties must be awarded, the court should consider in mitigation that there was no willful misconduct. They ask the court to consider their misplaced reliance upon the attorney they initially hired to represent the plans, Barry Jewell ("Jewell"), and the fact that they eventually terminated his services and hired new counsel to ensure that the plans complied with the law.

At the behest of the undersigned, the plaintiffs filed a submission in rebuttal in which they addressed a single question, that being, can civil penalties be imposed for an administrator's failure to provide ERISA-required information when the plan participants did not make a written request but never knew the plan existed. The plaintiffs maintain that penalties can indeed be imposed in such an instance.

29 U.S.C. 1132(c)(1) provides that civil penalties may be imposed when an administrator fails to provide a participant or beneficiary with timely plan information.[5] The undersigned begins an analysis of the plaintiffs' request for penalties by making three findings. First, penalties should be imposed solely upon the plan administrators. The statute provides for the imposition of penalties against the administrator, see Brown v. J.B. Hunt Transportation Services, Inc., 586 F.3d 1079 (8th Cir. 2009), and the plaintiffs have offered no persuasive reason for imposing them any other way.

Second, the failure of the administrator for the 1997 defined benefit plan to give timely "204(h) notice" should not be considered in determining civil penalties under 29 U.S.C. 1132(c)(1). The district court found that the administrator's failure to give timely "204(h) notice" was egregious, and, for that reason, the undersigned has recommended that the most favorable benefit accrual formula be used in re-calculating the benefits owed from that plan. See supra at 7-8.

Third, the plaintiffs maintain that the defendants were "required to produce all of the documents in 29 U.S.C. 1021 et seq. over all years from 1974 forward to the present for all plans, disclosed or not, with no action whatsoever required on the part

---

[5]

29 U.S.C. 1132(c)(1) specifically provides, in part, the following:

... Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title, section 1021(e)(1) of this title or section 1021(f), or section 1025(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary ... within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [now $110.00] a day from the date of such failure or refusal ...

of [the] [p]laintiffs." See Document 553 at 1. [Emphasis in original]. Like so many of the plaintiffs' assertions in the case at bar, this assertion is overbroad and lacks specificity. A plan administrator has never been required to disclose all of the documents in 29 U.S.C. 1021 and the code sections that follow without a request. Instead, the administrator is required to disclose some documents without a request, other documents must be disclosed only after a request, and some information need not be disclosed under any circumstance.[6]

The district court found that civil penalties should be imposed on count one of the plaintiffs' second amended complaint. As to that count, the district court found that penalties should be imposed upon Price's Utility for its failure to disclose the funding notices for the 1997 defined benefit plan. The defendants maintain in response that penalties should not be imposed because the notices were not added as a mandatory disclosure until the 2008 plan year, or well after the plaintiffs were terminated.

The disclosure of funding notices for defined benefit plans is governed by 29 U.S.C. 1021(f). Prior to the adoption of the Pension Protection Act of 2006, 29 U.S.C. 1021(f) provided, in part, that "[t]he administrator of a defined benefit plan which is a multi-employer plan shall for each plan year provide a plan funding notice to each plan participant and beneficiary …" See Amendments section of Historical and Statutory

---

[6]

For instance, the administrator is required to disclose an initial summary plan description without a request, see 29 U.S.C. 1024(b)(1), but must disclose an updated summary plan description only after a written request, see 29 U.S.C. 1024(b)(4). The undersigned knows of no requirement that an administrator disclose, as the plaintiffs allege in their second amended complaint, "the identities of the person or persons who received the millions from the plans." See Document 299 at 12.

Notes to 29 U.S.C. 1021.[7] It imposed no similar obligation on the administrator of a single-employer defined benefit plan. After the adoption of the Pension Protection Act of 2006, the mandatory disclosure obligation was extended to single-employer plans beginning for the 2008 plan year. 29 U.S.C. 1021(f) now provides, in part, that "[t]he administrator of a defined benefit plan … shall for each plan year provide a plan funding notice to … each plan participant and beneficiary …" This obligation is mandatory, and there is no requirement that the participant or beneficiary be an employee.

The district court found that benefit accruals for the 1997 defined benefit plan ceased in January of 2003. See Document 450 at 34, adopted at Document 459. There is no evidence, though, that the plaintiffs ceased being participants or a beneficiary at that time. Although the plaintiffs were terminated well before the 2008 plan year, there is no evidence that they had ceased being participants or a beneficiary at the beginning of 2008 or anytime thereafter because there is no evidence the plan, while "frozen," was ever formally terminated. They were therefore entitled to funding notices for plan years 2008 and forward, but the notices were not disclosed.[8] Because Price's Utility did not disclose the notices, civil penalties should be imposed.

---

[7]

The profit-sharing and 1997 defined benefit plans are not multi-employer plans.

[8]

Prior to the commencement of this litigation, the only information other than "some papers" any plaintiff received about the 1997 defined benefit plan was as follows: Kennith McDowell and Robert Maulding were provided "annual reports for the … plan[] for the three years prior to August of 2007; summary annual reports for [the plan] for the same period of time; and a current, as of August of 2007, Summary Plan Descriptions for [the plan], as well as prior Summary Plan Descriptions." See Document 450 at 18, adopted at Document 459. James Milner received a benefit statement from the profit-sharing plan in either 1974 or 1975. See Document 450 at 18, adopted at Document 459.

What amount of penalties should be imposed? The answer to that question typically depends upon when the obligation to disclose the plan funding notices arose and when they were disclosed. This case is not the typical case. The plaintiffs have failed to specifically identify the dates on which the obligation to disclose the notices arose, although it was likely in 2008, and when, if ever, the notices were disclosed. This uncertainty is of little consequence, though, because the undersigned would recommend the same amount of penalties regardless of when the obligation specifically arose and when, if ever, it was met.

The district court found that civil penalties should be imposed on count two of the plaintiffs' second amended complaint, a count specific to Kennith McDowell and Robert Maulding and one in which they allege the defendants failed to disclose requested documents and/or information. The district court also found that penalties should be imposed on count four, a count specific to all the plaintiffs and one in which they allege the plan administrators failed to make the mandatory disclosures required by ERISA.

The defendants were obligated to disclose some of the documents identified in counts two and four without a request, were obligated to disclose other documents identified in the counts only after a request, and were not obligated to disclose some of the information identified in the counts under any circumstance. Winnowing through the documents and/or information identified in the counts is a daunting task, particularly as to count two because the plaintiffs failed to cite the code sections supporting their requests. For purposes of the issue at bar, though, it is not necessary to undertake that

task because it is clear that minimal documents and/or information were provided, and only provided to Kennith McDowell and Robert Maulding after their requests. See Document 450 at 18, adopted at Document 459. At a minimum, both plan administrators failed to make the mandatory disclosures. With regard to the disclosures requiring a request, it appears that the requests made by Kennith McDowell and Robert Maulding as alleged in count two were responded to appropriately. To the extent they may not have been, there is a failure of proof on the plaintiffs' part. Nevertheless, it is clear that one response was untimely, and civil penalties should be imposed on count two.

29 U.S.C. 1021-1031 govern the disclosure requirements of ERISA, disclosures that enable a participant or beneficiary to learn of their rights and/or interests. The statutes provide that a plan administrator is obligated to disclose several plan documents to participants and beneficiaries without a request, including the following documents: (1) a summary plan description, see 29 U.S.C. 1024(b)(1);[9] (2) a summary of material modifications to the plan, see 29 U.S.C. 1024(b)(1); (3) a summary annual report, which is in part a summary of the 5500 report made annually to the Department of Labor, see 29 U.S.C. 1024(b)(1); and (4) an individualized benefit statement for each participant and beneficiary of a profit-sharing plan, see 29 U.S.C. 1025(a)(1)(A).

---

[9]

The summary plan description is at the heart of the ERISA disclosures. The document informs the participants and beneficiaries about the plan and how it operates. The document must be provided automatically to participants within ninety days of becoming covered under the plan and to beneficiaries within ninety days of first receiving benefits. See 29 C.F.R. 2520-104b-2. There is no merit to the defendants' assertion that the summary plan description need only be disclosed "upon request." See Document 543 at 1.

Save the minimal disclosures made to Kennith McDowell and Robert Maulding, none of which Price's Excavating or Price's Utility disclosed as a matter of course, the administrators of the profit-sharing and 1997 defined benefit plans did not make the disclosures mandated by ERISA and alleged in count four. At a minimum, the administrators did not disclose the summary plan descriptions or the summary annual reports for either plan.[10] In addition, Price's Excavating did not disclose an individualized benefit statement for each participant and beneficiary of the profit-sharing plan. Civil penalties should therefore be imposed.[11]

What amount of penalties should be imposed? The answer to that question typically depends upon when the obligations to make the disclosures arose and when they were made. This case is not the typical case. The plaintiffs have failed to specifically identify the dates on which the obligations arose, although it was likely in 1974 when the profit-sharing plan was created and 1997 when the defined benefit plan was created, and when, if ever, the disclosures were made. This uncertainty is of little consequence, though, because the undersigned would recommend the same amount of penalties regardless of when the obligation arose and when, if ever, it was met.

---

[10]

Although at least one of the plans were modified, see Document 319, Exhibit K at 506, it is not clear whether the modification was material. It is not clear whether the modification required a disclosure.

[11]

The plaintiffs list a number of documents and/or information the administrators failed to disclose. It appears that some of the documents and/or information were actually parts of other documents the administrators were obligated to disclose. For instance, the plaintiffs maintain that the administrators failed to disclose a "schedule of assets as required by 29 U.S.C. 1024(b)(3)(C)." See Document 299 at 38-39. The schedule of assets referred to by the plaintiffs is apparently just a component of the summary annual report and not a separate disclosure.

The statutes also provide that an administrator is obligated to disclose other plan documents to participants and beneficiaries only after a request, including the following: (1) the "latest updated summary plan description," the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated," see 29 U.S.C. 1024(b)(4); and (2) an individualized benefit statement for each participant and beneficiary of a defined benefit plan, see 29 U.S.C. 1025(a)(1)(B).

The only plaintiffs to request plan documents and/or information were Kennith McDowell and Robert Maulding, which is understandable because the other plaintiffs knew next to nothing about the two plans. Although Kennith McDowell and Robert Maulding allege in count two that they made six separate requests for documents and/or information between June 6, 2007, and September 30, 2008, see Document 299 at 10-14, the record only contains support for two such requests. It reflects that on June 26, 2007, Robert Maulding requested an accounting from the profit-sharing plan; he also requested a number of documents and/or information from the administrator of the plan.[12]

By July 9, 2007, the administrators of the profit-sharing and 1997 defined benefit plans had responded to Robert Maulding's request. In the response, the administrators represent to have provided the following:

---

[12] Counsel requested, inter alia, a copy of the plan and amendments, the date the plan started, the date it terminated, a copy of all plan audits, and "a full set of all plan contribution data as it relates to Robert Maulding, Jr." See Document 319, Exhibit K at 509.

> Enclosed is a copy of the most recent version of the [profit-sharing] plan. This plan was originally effective November 1, 1974, and the most recent plan amendment was effective on November 1, 2002. The plan was frozen many years ago. Enclosed are the annual benefit summarizes for your husband for the last three years, as well as the distribution paperwork for him to receive his vested benefit under the plan. In addition, enclosed is the distribution paperwork for your husband's benefit under the Price's Utility Contractors, Inc., Retirement Plan, of which your husband was also a participant, along with his benefit summaries under that plan for the last three years. This plan was adopted effective January 1, 1997, and was frozen in 2002.

See Document 319, Exhibit K at 506.

On July 9, 2007, Robert Maulding requested the data used to create the final disbursement of his account in the profit-sharing plan. He also requested "plan deposits and audited financials …" See Document 319, Exhibit K at 508. The same day, Kennith McDowell made a similar request. On July 12, 2007, the two plaintiffs requested several documents for the profit-sharing and 1997 defined benefit plans from the administrators. They requested, inter alia, "a copy of the … annual Department of Labor reports for each plan year and for each plan in which [Robert Maulding] or Kennith McDowell were plan participants" and a summary plan description booklet for "each plan and the summary annual report for each such plan for each year that [Robert Maulding] and Kennith McDowell were in each plan." See Document 319, Exhibit K at 504.

On August 16, 2007, the administrators of the profit-sharing and 1997 defined benefit plans authored a letter in response to Kennith McDowell and Robert Maulding's request. In the letter, the administrators represent to have provided the following:

-18-

Form 5500 Annual Reports for each plan [i.e., the profit-sharing and 1997 defined benefit plans] for the last three years.

Summary Annual Reports for each [p]lan for the last three years.

Most recent Summary Plan Descriptions for each plan, as well as the prior Summary Plan Descriptions for each plan.

See Document 319, Exhibit F at 477.

There is no support for any other requests being made by the plaintiffs. They allege that they made other requests after the commencement of this litigation, and, for purposes of this Recommendation, the undersigned assumes that such requests are encompassed within the ERISA statutes and were not discovery-related. The plaintiffs failed, though, to substantiate those requests, i.e., they failed to show when they made their requests, what they requested, or what code section compelled the disclosures.

What, then, of the plan administrators' responses? It appears that the response made by the administrator of the profit-sharing plan largely complied with Robert Maulding's request, at least as to the documents and/or information ERISA required the administrator to disclose. He was apparently provided an updated version of the plan, benefit summaries for three years, and, though not requested, benefit summaries for three years for the 1997 defined benefit plan. Although Robert Maulding objected to the response because it did not provide the data used to create the final disbursement, there is a failure of proof on his part. Without examining the documents actually provided, it is impossible to say whether the appropriate data was provided.

It also appears that the response made by the administrators on August 16, 2007, largely complied with Kennith McDowell and Robert Maulding's request, at least as to the documents and/or information ERISA required the administrators to disclose. They were provided the Form 5500 annual reports for three years, summary annual reports for three years, and the most recent summary plan description. Kennith McDowell and Robert Maulding have failed to offer any support for the proposition that the administrators were required to provide Form 5500 annual reports, summary plan descriptions, and summary annual reports for every year Kennith McDowell and Robert Maulding were participants in the plan. The response was, though, untimely because it was not tendered within thirty days. Civil penalties should therefore be imposed.

What amount of civil penalties should be imposed? The response prepared by the administrators on August 16, 2007, was untimely by approximately seven days as to the requests made on July 9, 2007, and by approximately four days as to the request made on July 12, 2007. Penalties should be imposed for those delays.

Before turning to actually determine the amount of penalties to be recommended, the undersigned finds it wise to briefly summarize the matters justifying the imposition of penalties. They should be imposed for the failure of Price's Utility to disclose the funding notices for the 1997 defined benefit plan as alleged in count one, for the failure of both Price's Excavating and Price's Utility to make the mandatory disclosures required by ERISA as alleged in count four, and for their failure to timely respond to the request made by Kennith McDowell and Robert Maulding as partially alleged in count four.

What amount of civil penalties should be imposed? In answering that question, the undersigned has looked to the factors outlined in Starr v. Metro Systems, Inc., 461 F.3d 1036 (8th Cir. 2006) and Pagovich v. Moskowitz, 865 F.Supp. 130 (S.D.N.Y.1994), two cases that focus upon, inter alia, the prejudice and harm done the plaintiffs and the plan administrator's bad faith or intentional misconduct.[13]

While Price's Excavating and Price's Utility were separate administrators administering separate plans, they largely managed the plans in the same manner. In short, neither administrator was forthcoming with documents and/or information mandated by ERISA. They do not, though, share identical positions for one principal reason. Price's Excavating began administering the profit-sharing plan in 1974. Price's Utility did not begin administering the defined benefit plan until 1997. Thus, the period during which Price's Excavating did not disclose the documents and/or information mandated by ERISA was twenty-three years longer than the period of non-disclosure involving Price's Utility.

---

[13]

In Starr v. Metro Systems, Inc., the Court of Appeals noted that the "purpose of the statutory penalty is to provide plan administrators with an incentive to comply with the requirements of ERISA … and to punish noncompliance." See Id. at 1040. Additionally, the Court of Appeals noted that "[i]n exercising its discretion to impose statutory damages, a court primarily should consider "the prejudice to the plaintiff and the nature of the plan administrator's conduct." … Although relevant, a defendant's good faith and the absence of harm do not preclude the imposition of the 1132(c)(1)(A) penalty. …" See Id.

In Pagovich v. Moskowitz, the district court noted that "[i]n determining whether to assess a penalty under 1132(c)(1) courts have considered such factors as bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." See Id. At 134. The district court cited, among other decisions, Garred v. General American Life Ins. Co., 774 F.Supp. 1190 (W.D.Ark.1991) (penalties were assessed due to the willful conduct of the administrator and the harm suffered by plaintiffs in the form of aggravation, frustration, and the need to hire an attorney to wage a lengthy court battle).

Applying the relevant factors, the plaintiffs suffered harm by not receiving the documents mandated by ERISA. The district court has found that with the exception of Kennith McDowell, Robert Maulding, and James Milner, the plaintiffs never even knew they were participants or a beneficiary of the profit-sharing and 1997 defined benefit plans until after the commencement of this litigation. See Document 450 at 14-18, adopted at Document 459. Because they did not know of their entitlement to benefits, they were prevented from gaining a clear picture of their financial position, a situation that may have impacted, inter alia, the employment decisions they made after they were terminated. As to Kennith McDowell, Robert Maulding, and James Milner, they undoubtedly suffered some additional measure of aggravation and frustration because they knew generally of the plans, but they obtained little information about them.

It is not clear why the defendants did not inform the plaintiffs about the plans created, at least in part, for their benefit. Although there is evidence that the Prices rebuked their employees for even discussing the plans, the undersigned is not prepared to embrace the plaintiffs' apparent assertion that the Prices created the plan solely for their own benefit. The most likely explanation for the neglectful administration of the plans is that the defendants chose to be deliberately ignorant of their legal obligations under ERISA, see Document 450 at 19-21, and chose to simply rely upon Jewell's counsel.

Despite the harm and prejudice suffered by the plaintiffs, the undersigned is not convinced that Price's Utility and Price's Excavating demonstrated bad faith or intentional misconduct. The plaintiffs produced no evidence that the defendants'

misappropriated monies from the plans. They took the necessary steps to correct problems relating to disclosures and benefit distributions identified by the Department of Labor. See Document 450 at 19-21, 27-28. The undersigned also credits the defendants' assertion that they eventually terminated Jewell's representation and hired new counsel to ensure that the plans were in compliance with governing law. The imposition of civil penalties is tempered by the aforementioned findings.

Applying the relevant factors, including the harm and prejudice to the plaintiffs and the nature of the administrators' conduct, the undersigned recommends the following:

1) on count one of the plaintiffs' second amended complaint, the undersigned recommends that **Price's Utility** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to provide them with funding notices for the 1997 defined benefit plan as required by 29 U.S.C. 1021(f) for plan years 2008 forward: (1) Kennith McDowell, $1,000.00; (2) Robert Maulding, $1,000.00; (3) Luther Stripling, $1,000.00; (4) Rudy Kyle, $500.00; (5) Fred Dollar, $500.00; (6) James Joslin, $500.00; (7) Joe Ellis, $250.00; (8) Daniel Stripling, $100.00; and (9) Janet Stripling, on behalf of Royce Stripling, $500.00.

2) on count two, the undersigned recommends that **Price's Excavating** be ordered to pay civil penalties to Kennith McDowell and Robert Maulding in the following amounts for its failure to provide a timely response to their July of 2007 requests for documents and/or information: (1) Kennith McDowell, $500.00, and (2) Robert Maulding, $500.00.

3) on count two, the undersigned recommends that **Price's Utility** be ordered to pay civil penalties to Kennith McDowell and Robert Maulding in the following amounts for its failure to provide a timely response to their July of 2007 requests for documents and/or information: (1) Kennith McDowell, $500.00, and (2) Robert Maulding, $500.00.

4) on count four, the undersigned recommends that **Price's Excavating** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to make the mandatory disclosures for the profit-sharing plan required by ERISA for the years 1974 forward: (1) Kennith McDowell, $5,000.00; (2) Robert Maulding, $5,000.00; (3) Luther Stripling, $1,250.00; (4) Rudy Kyle, $125.00; (5) James Milner, $5,000.00; and (6) Janet Stripling, on behalf of Royce Stripling, $5,000.00.

5) on count four, the undersigned recommends that **Price's Utility** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to make the mandatory disclosures for the 1997 defined benefit plan required by ERISA for the years 1997 forward: (1) Kennith McDowell, $2,500.00; (2) Robert Maulding, $2,500.00; (3) Luther Stripling, $2,500.00; (4) Rudy Kyle, $500.00; (5) Fred Dollar, $500.00; (6) James Joslin, $500.00; (7) Joe Ellis, $250.00; (8) Daniel Stripling, $100.00; and (9) Janet Stripling, on behalf of Royce Stripling, $1,000.00.

ATTORNEY'S FEES. The plaintiffs have also filed a motion for attorney's fees and costs. See Document 540. In the motion, they request $667,155.00 in attorney's fees, a number arrived at by multiplying their attorney's requested hourly rate of $300.00 by the 2,223.85 hours she claims to have spent on the case.

-24-

The defendants oppose the plaintiffs' motion for attorney's fees and costs for a number of reasons. Among the reasons advanced by the defendants, they maintain that the plaintiffs' attorney should not be compensated at the hourly rate of $300.00 or for 2,223.85 hours because neither number is justified. As to the hourly rate requested by the counsel, the defendants maintain that she cannot command such a large hourly fee. As to the number of hours she allegedly spent, they maintain that the hours are far out of proportion to what this litigation required. The defendants also maintain that any fee awarded the plaintiffs should be reduced because counsel created unnecessary expense in this litigation.

29 U.S.C. 1132(g)(1) provides, in part, that "the court in its discretion may allow a reasonable attorney's fee ... to either party." Fees may be awarded "as long as the fee claimant has achieved 'some degree of success on the merits.'" See Hardt v. Reliance Standard Life Insurance Company, — U.S. —, 130 S.Ct. 2149, 2152, 176 L.Ed.2d 998 (2010) [quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 694 (1983)]. If it is determined that the fee claimant has achieved some degree of success on the merits, the court must determine whether an award of fees is appropriate by considering, inter alia, the following factors:

> (1) the degree of culpability or bad faith which can be assigned to the opposing party, (2) its ability to pay, (3) the potential for deterring others in similar circumstances, (4) whether the moving party sought to benefit all plan participants or beneficiaries or to resolve a significant legal question regarding ERISA, and (5) the relative merits of the parties' positions.

See Lawrence v. Westerhaus, 749 F.2d 494, 496 (8th Cir. 1984). These factors are "by no

-25-

means exclusive or to be mechanically applied." See Martin v. Arkansas Blue Cross and Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002). "Instead, the district courts should use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." See Id. If the factors establish that an award of fees is appropriate, the court must then examine the fees requested and limit them to a reasonable amount. As to that question, Chief United States District Judge Leon Holmes found the following factors helpful in determining reasonable attorney's fees:

> "Just what is a reasonable attorney's fee is a matter peculiarly within the district court's discretion." Greater Kansas City Laborers Pension Fund v. Thummel, 738 F.2d 926, 931 (8th Cir. 1984). The Eighth Circuit has cited with approval the factors adopted by the Ninth Circuit in Seymour v. Hull & Moreland Eng'g., 605 F.2d 1105, 1117 (9th Cir. 1979), for determining the reasonableness of attorney's fees awarded under ERISA: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undersirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the awards in similar cases. See Thummel, 738 F.2d at 931 (describing the Seymour factors as "legitimate factors which in some if not most cases are to be considered by the district court in deciding what a reasonable fee is").

See Watson v. USAble Life, 2009 WL 799022 at 3 (E.D.Ark. March 24, 2009). "The party requesting the fee award bears the burden of substantiating the requested rate as well as the hours expended." See Retro Television Network, Inc. v. Luken Communications,

LLC, 2012 WL 682372 at 2 (E.D.Ark. 2012) (Wright, J.) [citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)].

The undersigned begins by finding that the plaintiffs achieved some degree of success on the merits. It took the commencement of this litigation for some of the plaintiffs to discover the existence of the profit-sharing and/or 1997 defined benefit plans, that some of the plaintiffs are entitled to benefits from one or both of the plans, and for some of the plaintiffs to obtain correct benefit calculations from one or both of the plans. The plaintiffs' success was neither trivial nor insignificant but was instead meaningful.

Having found the foregoing, the undersigned turns to the Westerhaus factors. With regard to the defendants' culpability or bad faith, the evidence is conflicting. As noted above, it is not completely clear why the defendants did not inform the plaintiffs about the plans created, at least in part, for the plaintiffs' benefit. Although there is evidence that the Prices rebuked their employees for discussing the plans, see Document 319 at 476B, the undersigned is not prepared to embrace the plaintiffs' apparent assertion that the Prices created the plans solely for their own benefit. Two of the plaintiffs at least learned of the plans during the course of their employment, see Document 450 at 17-18, so it is unlikely that the plans were a closely guarded secret. The more likely explanation is that this situation was born out of the defendants' deliberate ignorance of their legal obligations under ERISA, see Document 450 at 19-21, and their reliance upon Jewell. Nevertheless, some culpability must be laid at the feet of the defendants. Had they been

forthcoming to the plaintiffs with information and documents relating to the plans, it is possible that litigation could have been avoided or at least the scope of this case could have been narrowed.

The undersigned additionally finds that the defendants caused some of the confusion that arose prior to and during this litigation, particularly with regard to the plans at issue. The defendants continually represented that there are only two plans, those being, the profit-sharing plan and the 1997 defined benefit plan. While true, the representation did not adequately explain the existence of a second defined benefit plan, a plan that existed between 1983 and 1998 or 1999. See Document 450 at 7-10. The defendants also drafted or proposed a number of "prototype plans," see Document 450 at 11-13, which the defendants produced during discovery.[14] The "prototype plans" caused the plaintiffs to believe there were several additional plans. It was not until this case reached the summary judgment stage that it became clear the "prototype plans" were not plans at all but were instead drafts or proposed amendments to the existing plans. Although it is possible that the plaintiffs would not have believed a simple, concise, and clear explanation from the defendants of the plans and "prototype plans" in this case, such an explanation would have gone a long way in eliminating some of the confusion.

There are other facts, though, that suggest the defendants are not culpable or

---

[14]

"Prototype plans" is a phrase used by the plaintiffs' expert witness, David Kays, who testified during a hearing before United States Magistrate Henry L. Jones, Jr. See Document 289 at 117.

otherwise did not demonstrate bad faith. The plaintiffs produced no evidence that the defendants misappropriated monies from the plans. <u>See</u> Document 450 at 22-26. The defendants took the necessary steps to correct problems relating to disclosures and benefit distributions identified by the Department of Labor, <u>see</u> Document 450 at 19-21, 27-28, and the undersigned credits the defendants' assertion that they eventually terminated Jewell's representation and hired new counsel to ensure that the plans were in compliance with governing law. Last, it should be noted that they at least attempted to distribute the benefits they believed were owed the plaintiffs, although many of those calculations later proved to be erroneous. <u>See</u> Document 450 at 36.

With regard to the relative merits of the parties' positions, the evidence is not conflicting. Although it took this litigation for most of the plaintiffs to learn of the profit-sharing and 1997 defined benefit plans and obtain correct benefit calculations, the plaintiffs' positions throughout this case have caused it to mushroom into much more than it ever should have become. Their pleadings were excessively long and contained allegations that described serious misconduct on the part of the defendants. Their voluminous pleadings were long on sweeping allegations but short on factual support and made the completion of this case a great challenge. They filed irrelevant pleadings, took an appeal to the district court of almost every ruling made by the Magistrate Judges assigned to this case, and took a frivolous appeal to the Court of Appeals.[15] Recently, the

---

[15]

Rather than recount every frivolous pleading the plaintiffs filed, the undersigned simply adopts the defendants' recital of those pleadings outlined in their response to the plaintiffs' motion for attorney's fees

plaintiffs filed a request for civil penalties totaling roughly $878,000,00.00. It is difficult to properly characterization such a request. In short, the plaintiffs' prosecution of this case caused the opposing party and the courts to expend an excessive amount of time and resources.

For these reasons, the amount of attorney's fees and costs awarded the plaintiffs should be reduced substantially. Although the evidence of the defendants' culpability or bad faith is conflicting, the evidence of the relative merits of the parties' positions is not. Again, the plaintiffs' prosecution of this case caused the opposing party and the courts to expend an excessive amount of time and resources.[16]

What, then, are reasonable attorney's fees? In answering that question, the undersigned begins by noting that the time and labor required of ERISA cases, and the novelty and difficulty of questions involved in such litigation, can be quite substantial. For that reason, ERISA cases can be less desirable than other types of cases, and the skill requisite to perform the legal services properly is great. The case at bar, though, is not such an instance but is, or should have been, a relatively simple, straightforward case to determine the benefits owed the plaintiffs from the profit-sharing and 1997 defined

---

and costs. See Document 549 at 5-6. As to the number of appeals taken to the district court, it was noted that as of April 17, 2012, the plaintiffs had taken nine such appeals. See Document 537 at 4 n.2. As to the appeal to the Court of Appeals, the plaintiffs appealed a district court ruling that compelled them to pay an expert witness fee. The appeal was dismissed on the defendants' motion. See Document 400.

[16]

The other Westerhaus factors are of less relevance. The defendants appear to have the ability to pay attorney's fees, requiring them to pay would undoubtedly serve to deter others in similar circumstances, and the undersigned credits the plaintiffs' assertion that they attempted to benefit all participants and/or beneficiaries of the plans.

benefit plans. There was nothing novel or difficult about this case as the factual and legal issues were not complicated, but the case became much more. Although the defendants bear some of the blame, the lion's share of the blame falls on the plaintiffs.

The plaintiffs' attorney represents, and the undersigned finds, that she took this case without any assurance of being paid. See Document 541 at 1, n.1. Thus, she took a substantial risk that she would never be paid for the time she devoted to the case. The undersigned has no real insight into whether her decision to accept the case precluded her from other employment; although given the amount of time she claims to have spent, it is difficult to see how the case would not have precluded other work.

The plaintiffs' attorney has offered no insight into the attorney's fees customarily requested in ERISA cases nor the time limitations imposed by her clients or the circumstances. As to the former, she represented the following: "… counsel has no idea what other local attorneys charge for ERISA litigation as … counsel is not aware of any other attorney engaged in the practice." See Document 541 at 3. The undersigned has reviewed several ERISA cases from this district and one from the Western District of Arkansas. Many, if not most, of those cases settled before the question of attorney's fees was ever considered. Of the cases that reached the point of addressing attorney's fees, the cases reflect that attorneys have requested between $165.00 to $275.00 an hour. See e.g., Lowery v. UNUM Life Insurance Company of America, 3:09CV00013 BRW ($165.00 requested); Watson v. USAble Life, 4:08CV00809 JLH ($250.00 requested). See also Helm v. Sun Life Assurance Company of Canada, 2009 WL 524937 (W.D.Ark. 2009) (Hendren,

J.) ($275.00 for partner and $200.00 for associate requested); McAllister v. Life Insurance Company of North America, 2009 WL 1560159 (E.D.Ark. 2009) (Wilson, J) ($250.00 requested).

As to the amount involved, it is undeniable that a substantial amount of money was involved in this litigation. The total benefits to be paid the plaintiffs from the profit-sharing plan are approximately $120,000.00. The total benefits paid or to be paid the plaintiffs from the 1997 defined benefit plan are approximately $783,000.00.[17] The result produced by this litigation, though, is not comparable. With regard to the benefits owed from the profit-sharing plan, the plaintiffs are receiving roughly what they were tendered in benefits prior to this case. Thus, it accomplished little in that respect. With regard to the benefits owed from the 1997 defined benefit plan, the plaintiffs have received or are receiving a total of approximately $195,000.00 more than they were tendered in benefits prior to this case. Thus, any increase in benefits resulting from this litigation was from the 1997 defined benefit plan only.

Aside from this case, the undersigned has no insight into the experience, reputation, and ability of the plaintiffs' attorney. The undersigned simply accepts the representations she made in her affidavit as to her experience and ability. The undersigned also has little insight into the nature and length of the professional relationship she has had with her clients.

---

[17]

Again, it should be noted that some of the plaintiffs have taken distributions from their accounts in the 1997 defined benefit plan. See Document 539 at 3.

The last factor focuses on the awards in similar cases. The plaintiffs' attorney has offered no insight into what awards in similar cases have been. The ERISA cases the undersigned previously cited reflect the following awards: <u>Lowery v. UNUM Life Insurance Company of America</u>, 3:09CV00013 BRW ($8,251.00 in attorney's fees awarded in case re-instating benefits); <u>Watson v. USAble Life</u>, 4:08CV00809 JLH ($8,520.00 in attorney's fees awarded in case remanding administrative decision); <u>Helm v. Sun Life Assurance Company of Canada</u>, 2009 WL 524937 ($23,511.00 in attorney's fees awarded in case re-instating benefits and awarding $240,000.00 in past-due benefits);[18] and <u>McAllister v. Life Insurance Company of North America</u>, 2009 WL 1560159 ($12,475.00 in attorney's fees awarded in case awarding benefits).

Given the foregoing, how much should the plaintiffs be awarded in attorney's fees? In answering that question, the undersigned utilizes the lodestar method of calculating fees, a method approved by countless courts.

The undersigned recommends that the plaintiffs' attorney be compensated at the hourly rate of $165.00. The number strikes an appropriate balance between the competing interests outlined above.

The plaintiffs' attorney asks to be compensated for 2,223.85 hours of work and submitted her time sheets in connection with the request. A few observations about the

---

[18]

In <u>Helm</u>, Judge Hendren found that the prevailing market rate for an experienced attorney in this type of case in this locale is $225.00 a hour and $150.00 an hour for an associate. For Judge Hendren's decision re-instating benefits and awarding past-due benefits, <u>see</u> 624 F.Supp. 2d 1034.

entries on her time sheets are in order. First, a number of the entries cannot be deciphered as they border on illegible. Second, it is not clear what a number of entries involve; for instance, there are a number of entries for "ltr - DOL," ltr - Jewell," or "ltr - cl," "to SR," "calls," "ltr.," "research," and other cryptic entries. It is axiomatic that "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly." See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Third, a number of entries appear to be associated with frivolous work. For instance, it appears that counsel devoted roughly eighty hours to a frivolous appeal to the Court of Appeals and untold hours to preparing frivolous motions after the district court adopted the undersigned's recommendation. Last, it appears that she devoted an unreasonable amount of time to legitimate endeavors that should not have required such time. For instance, it appears that counsel devoted an unreasonable amount of time in the summer and fall of 2010 to preparing a motion for summary judgment and responding to one from the defendants.[19] In light of the foregoing observations, and having weighed the various competing interests, the undersigned recommends that counsel be compensated for 125 hours.

The undersigned recommends that the plaintiffs be awarded their attorney's fees. They should be awarded their attorney's fees in the amount of $20,625.00, or for 125

---

[19]

The defendants construe the entries to reflect that she devoted 259.60 hours to those pleadings. Although the undersigned is not prepared to embrace the defendants' construction, it is clear that she devoted an extraordinary amount of time to the endeavors.

hours of work at the hourly rate of $165.00.

COSTS. The plaintiffs also request their costs. See Document 540. They request $16,167.03 in costs associated with depositions and expert witnesses; $6,934.60 in copying costs; and $2,572.63 in postage costs. The defendants do not object to the types of costs; their only objection is to the amount of the costs.

29 U.S.C. 1132(g)(1) provides, in part, that the court may allow a party to recover the costs of the action. The allowable costs are those routinely chargeable under 28 U.S.C. 1920 and "reasonable out-of-pocket expenses incurred by an attorney which typically would be charged to a fee-paying client …" See Antolik v. Saks, Inc., 407 F.Supp.2d 1064, 1079 (S.D.Iowa), reversed on other grounds, 463 F.3d 796 (8th Cir. 2006) (ERISA case).

The undersigned has examined the documents offered by the plaintiffs in support of their request for costs. The documents are plagued by many of the same problems besetting the plaintiffs' time sheets. For instance, there is no clear explanation of what many of the documents are. In addition, it is not clear whether the costs identified in the documents are associated with relevant work that was completed in a reasonable amount of time because, as the undersigned has found, the plaintiffs' attorney devoted herself to much frivolous work and devoted an unreasonable amount of time to otherwise relevant endeavors.

Turning to the specifics of the plaintiffs' request, they first request $16,167.03 in costs associated with "depositions, service of process, copies at Office Depot, court

reporters, depositions rooms, [and] deposition services for the video deposition of [James] Turpin …" See Document 541 at 10. They add that "[a]ny postage or copies particular to these services is not duplicated in [the amount they otherwise seek for copying and postage]." See Document 541 at 10.

The documents offered by the plaintiffs in support of their request are problematic for several reasons. First, the plaintiffs failed to fully substantiate their request. Although it may be due to their failure to clearly explain what each document is, it appears that they have only documented approximately $14,000 in costs associated with depositions and expert witnesses. See Document 541 at 33-61, 68. Second, they have submitted what appear to be receipts for approximately $500.00 in copying and/or printing costs from an Office Depot location in North Little Rock, Arkansas. See Document 541 at 50-60. The undersigned has no idea whether the receipts are associated with relevant work. Third, it appears that the plaintiffs paid for both a $240.00 DVD of James Turpin's deposition and $410.00 in "hard copies" of his deposition. See Document 541 at 47-49. It is not clear why they needed both a DVD and "hard copies" of his deposition. Last, although the charges associated with the depositions and expert witnesses appear to be largely within reason, the $4,222.00 the plaintiffs ask the defendants to pay for a representative of Plan Administration and Consulting of Memphis, Tennessee, to review documents and travel to Little Rock, Arkansas, to testify during a hearing gives the undersigned some pause. See Document 541 at 41-42; Document 319, Exhibit D, Part 1 at 48-106; Document 319, Exhibit D, Part 2 at 87-92. In contrast, a representative of

Acuff and Associates of Brentwood, Tennessee, only billed the plaintiffs $2,643.12 for somewhat similar services. See Document 541 at 36-37; Document 319, Exhibit D, Part 2 at 1-33. The undersigned is nevertheless convinced that the plaintiffs should be awarded most of their costs associated with depositions and expert witnesses. The case at bar clearly called for the assistance of experts trained in the field of profit-sharing and defined benefit plans. Taking into account the competing interests outlined throughout this recommendation, the undersigned recommends that the plaintiffs be awarded $14,000.00 in costs associated with depositions and expert witnesses.

The plaintiffs also request $6,934.60 in copying costs and $2,572.62 in postage costs. As to the former, they represent that they made 34,673 copies at a cost of twenty cents a copy during the course of this case. As to the latter, they represent that they paid $2,572.63 in postage. They support their representations with three pages of entries reflecting the costs of their copies and postage. See Document 541 at 25-27.

The entries prepared by the plaintiffs are problematic primarily for one reason: the documentation is inadequate. The undersigned has no idea what the entries are or whether they are associated with relevant work that was completed in a reasonable amount of time. Choosing one date at random, the plaintiffs ask to be compensated for thirty-six copies and $4.40 in postage incurred on October 5, 2011. See Document 541 at 27. The undersigned has no way of reviewing the propriety of such an entry. The undersigned is nevertheless convinced that the plaintiffs should be awarded some costs associated with copying and postage. There are eleven plaintiffs, and their attorney has

an obligation to keep them informed as to the progress of this litigation. Taking into account the competing interests, the undersigned recommends that the plaintiffs be awarded $1,000.00 in copying costs and $500.00 in postage costs.

RECOMMENDATION. On the basis of the foregoing, the undersigned recommends the following:

1) the following plaintiffs are owed benefits in the following amounts from the profit-sharing plan as of October 31, 2011: (1) Kennith McDowell, $21,017.79; (2) Robert Maulding, $38,833.27; (3) Luther Stripling, $4,537.56; (4) Rudy Kyle, $274.81; (5) James Milner, $19,479.70; and (6) Janet Stripling, on behalf of Royce Stripling, $35,941.30.

2) the defendants be ordered to provide a second round of updated calculations for the profit-sharing plan and pay those amount, taking into account any changes in the balances that have occurred since October 31, 2011.

3) the benefits owed the plaintiffs from the 1997 defined benefit plan be calculated using the following percentages:

a) for the period beginning January 1, 1997, i.e., the effective date of the plan, up to January 1, 1999, forty-five percent;

b) for the period beginning January 1, 1999, up to December 31, 2000, 47.50 percent; and

c) for the period beginning December 31, 2000, up to January 1, 2003, i.e., the date benefit accruals under the plan were terminated, forty-nine percent.

4) the following plaintiffs be paid benefits in the following amounts from the 1997 defined benefit plan: (1) Kennith McDowell, $106,699.12; (2) Robert Maulding, $150,297.19; (3) Luther Stripling, $108,699.12; (4) Rudy Kyle, $10,970.85; (5) Fred Dollar, $13,253.42; (6) James Joslin, $11,001.99; (7) Joe Ellis, $1,654.57; (8) Daniel Stripling, $268.29; and (9) Janet Stripling, on behalf of Royce Stripling, $38,864.91.

5) the district court not disturb the previous finding that Daniel Stripling is owed benefits from the 1997 defined benefit plan in the amount of $268.29.

6) the plaintiffs' motion for civil penalties be granted, <u>see</u> Document 465.

7) the civil penalties should be imposed solely upon the plan administrators, not upon the Prices as trustees.

8)  the failure of Price's Utility to give timely "204(h) notice" should not be considered in determining civil penalties under 29 U.S.C. 1132(c)(1).

9) the district court not disturb the finding that civil penalties be imposed on counts one, two, and four because Price's Utility failed to disclose the funding notices for the 1997 defined benefit plan as alleged in count one, both administrators failed to make the mandatory disclosures required by ERISA as alleged in count four, and both administrators failed to timely respond to the request made by Kennith McDowell and Robert Maulding as partially alleged in count four.

10) on count one, **Price's Utility** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to provide them with funding notices for the 1997 defined benefit plan as required by 29 U.S.C. 1021(f) for plan years 2008

forward: (1) Kennith McDowell, $1,000.00; (2) Robert Maulding, $1,000.00; (3) Luther Stripling, $1,000.00; (4) Rudy Kyle, $500.00; (5) Fred Dollar, $500.00; (6) James Joslin, $500.00; (7) Joe Ellis, $250.00; (8) Daniel Stripling, $100.00; and (9) Janet Stripling, on behalf of Royce Stripling, $500.00.

11) on count two, **Price's Excavating** be ordered to pay civil penalties to Kennith McDowell and Robert Maulding in the following amounts for its failure to provide a timely response to their July of 2007 requests for documents and/or information: (1) Kennith McDowell, $500.00, and (2) Robert Maulding, $500.00.

12) on count two, **Price's Utility** be ordered to pay civil penalties to Kennith McDowell and Robert Maulding in the following amounts for its failure to provide a timely response to their July of 2007 requests for documents and/or information: (1) Kennith McDowell, $500.00, and (2) Robert Maulding, $500.00.

13) on count four, **Price's Excavating** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to make the mandatory disclosures for the profit-sharing plan required by ERISA for the years 1974 forward: (1) Kennith McDowell, $5,000.00; (2) Robert Maulding, $5,000.00; (3) Luther Stripling, $1,250.00; (4) Rudy Kyle, $125.00; (5) James Milner, $5,000.00; and (6) Janet Stripling, on behalf of Royce Stripling, $5,000.00.

14) on count four, **Price's Utility** be ordered to pay civil penalties to the following plaintiffs in the following amounts for its failure to make the mandatory disclosures for the 1997 defined benefit plan required by ERISA for the years 1997 forward: (1) Kennith

McDowell, $2,500.00; (2) Robert Maulding, $2,500.00; (3) Luther Stripling, $2,500.00; (4)

Rudy Kyle, $500.00; (5) Fred Dollar, $500.00; (6) James Joslin, $500.00; (7) Joe Ellis,

$250.00; (8) Daniel Stripling, $100.00; and (9) Janet Stripling, on behalf of Royce

Stripling, $500.00.

15) the plaintiffs' motion for attorney's fees and costs be granted, see Document

540, and they be awarded attorney's fees in the amount of $20,625.00 and costs in the

total amount of $15,500.00.[20]

DATED this _____6_____ day of September, 2012.

_____
UNITED STATES MAGISTRATE JUDGE

---

[20]

The $15,500.00 in costs that should be awarded the plaintiffs are arrived at by adding the $14,000.00 in costs associated with depositions and expert witnesses, $1,000.00 in copying costs, and $500.00 in postage costs.